SHANNON, Respondent, v. NEW YORK & Q. ELECTRIC LIGHT & POWER CO., Appellant. (Supreme Court, Appellate Division, Second Department. December 15, 1904.) Action by William L. Shannon against the New York & Queens Electric Light & Power Company. Eugene Lamb Richards, Jr., for appellant. Geo. V. S. Williams (Melville J. France, on the brief), for respondent.

PER CURIAM. Judgment and order affirmed, with costs.

WOODWARD, J. (dissenting). The plaintiff was given a verdict of $800 in an action for personal injuries alleged to have been sustained through the negligence of the defendant. The complaint alleged that the injury was the result of "the gross negligence and carelessness of the defendant," without stating any particular act of negligence. The bill of particulars subsequently declared the defendant "was negligent and careless in not providing competent fellow servants, and in not providing suitable apparatus, while this plaintiff was at work helping to lower the pole, and in not providing a suitable number of fellow servants to work at such an undertaking." There was no evidence offered in reference to the allegation of neglect to provide competent fellow servants, although the defendant's answer had put all of the material allegations of the complaint in issue. The only evidence in reference to suitable apparatus is the testimony of the plaintiff that a "dead man," a contrivance in the form of a crotch, sometimes used to sustain a pole while being taken down, was not used in connection with the lowering of this particular pole, although he testifies that "there were five men taking down this pole, and one dead man, and one pike pole," so that there appears to have been furnished by the defendant the only particular piece of apparatus which is suggested as having been necessary, although the same was not made use of in this particular instance, and the negligence suggested is that one Mr. Anderson, described by the plaintiff as superintendent, happened along "at the time we were about to give the first lift on it, after the dirt and soil had been removed and the trench dug," to quote the testimony of the plaintiff's witness Fitzgerald. "and he stood there at my shoulder and watched and superintended and directed the operation." The plaintiff testified, over the objection and exception of the defendant, that he did not say anything to Mr. Anderson, but that the latter said: "Go ahead, Bill, and pike that pole." The plaintiff then testified as follows: "I says: 'Ed, we ought to have two men here. That is a larger pole than the one we were piking.' He says: 'Go ahead, Bill. You can pike that.' So I heard some one holler, and I got out on the bank. The pole rebounded, and struck me before I could get out of the way." There is no suggestion that the plaintiff or his fellow servants intended to make use of the

"dead man." The fair inference from the evidence is that these five men, with the "dead man" and pike pole, were all in position when Anderson arrived on the scene. He did not forbid the use of the "dead man." No one appears to have suggested its use, and, so far as the evidence discloses, neither the plaintiff nor any of his fellow servants had any idea of doing anything different from what it is claimed was directed by Anderson. The plaintiff had had experience in this line of work, had helped to take down at least 50 poles, and the work had been done with the same gang which was at work on the occasion of this accident; and it is not suggested that anything had happened to show that the number employed was not sufficient for the safety of those engaged. The only thing to differentiate this pole from those which had been previously taken down is the fact, disputed by defendant's witnesses, that this pole was about 35 feet long, instead of 25 feet; but it appears from the plaintiff's own testimony, as well as that of his witnesses, that the earth had been dug away from this pole, and all of the preliminaries had been accomplished, when Anderson arrived upon the scene, apparently by accident. Neither the plaintiff nor any of his fellow servants appears to have thought that it was necessary to use the "dead man," or to have any extra help, until Anderson directed the plaintiff to pike the pole, when it appears to have occurred to the plaintiff that he ought to have help, as the pole was larger, but Anderson said: "Go ahead, Bill. You can pike that"—and the plaintiff appears to have acquiesced in Anderson's judgment of his prowess, knowing all of the facts and circumstances as well as Anderson could have known them, and undertook the work of piking the pole. This work he accomplished successfully. He did all that was expected of him, so far as the evidence discloses, and the pole fell, just as it was expected to fall; the accident resulting from an unexpectedly long rebound as the pole reached the earth. There is no evidence in the case that the number of men engaged in the work was not reasonably sufficient for the purpose, using the implements supplied by the defendant. There is no evidence that the pole would not have been permitted to fall, as it did, if there had been more men employed in piking the pole; for the plaintiff testified: "Wherever I was, I put myself safe, from the fact that this pole was about to fall. I knew what they intended to do was to take it out of the hole and let it fall in the street." And this was undoubtedly what was ordinarily done, except in cases where the fall of the pole would be likely to injure property. The injury to the plaintiff did not result from any lack of numbers employed, if it was the custom and intention of those employed to permit the pole to fall in the street, but from the fact that the pole, taken down in the usual way, struck its extension arm upon the hard surface of the roadway and rebounded differently from what had been anticipated. It seems clear to us that it was the duty of the plaintiff, if he would charge the defendant, to show that the latter had neglected some duty that it owed to him, that some different result might reasonably have been expected, and that the defendant should have known

this in the exercise of reasonable care, if an additional number of men had been employed. Clearly, if this pole had been piked by a dozen men, and had been permitted to fall in the street, the plaintiff might have been injured by the rebound quite as well as under the facts disclosed. Of course, if the proper and established method of lowering telephone or other poles carrying electric wires was to bring them down gradually, by the use of "dead men" and a large number of pike poles, it might be negligent for the defendant to fail to provide a sufficient number of men to lower these poles in the regular way; but if it was customary to let these poles fall —and this is clearly suggested by the plaintiff's own testimony—it is difficult to see how the defendant could be charged with negligence because this particular pole, after it had been permitted to fall, and after it had fallen just as it was expected to fall, happened to rebound in a manner which was not anticipated by any of those engaged in the employment. How could the defendant know that this particular pole would rebound differently from others? The judgment and order appealed from should be reversed, and new trial granted; costs to abide the event.

JENKS, J., concurs.